1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DAVID L. JORDAN  (SBN:  203457)
dljordan@grsm.com
MYLES LANZONE  (SBN:  257791)
mlanzone@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
Telephone:  (415) 875-3323
Facsimile:  (415) 986-8054

Attorneys for Plaintiffs
GREENPOWER MOTOR COMPANY INC. and
GREENPOWER MOTOR COMPANY, INC.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREENPOWER MOTOR COMPANY, INC., a Delaware corporation; GREENPOWER MOTOR COMPANY INC., a Canadian corporation, | CASE NO. |
| Plaintiffs, | **COMPLAINT OF GREENPOWER MOTOR COMPANY INC. AND GREENPOWER MOTOR COMPANY, INC. AGAINST PHILLIP OLDRIDGE, DAVID OLDRIDGE, ET AL.** |
| v. | |
| PHILLIP OLDRIDGE, an individual; DAVID OLDRIDGE, an individual; SUSAN EMRY, an individual; S & P 500 FINANCIAL AND CORPORATE SERVICES INC., a Kansas corporation; ENVIROTECH ELECTRIC VEHICLES INC., a Canadian Corporation; EVT MOTORS INC.; ENVIROTECH DRIVE SYSTEMS INCORPORATED, a Wyoming corporation; ENVIROTECH DRIVE SYSTEMS INCORPORATED, a Canadian corporation; ENVIROTECH VEHICLES, INC., a Delaware Corporation; JOHN DOE TRUSTEE #1; and DOES 1-50 inclusive, | **JURY TRIAL DEMANDED** |
| Defendants. | |

COMPLAINT OF GREENPOWER MOTOR COMPANY INC. and GREENPOWER MOTOR COMPANY, INC.
Case No.

Plaintiffs GreenPower Motor Company Inc. and GreenPower Motor Company, Inc. allege as follows:

## THE PARTIES

1.      Plaintiff GreenPower Motor Company Inc. ("GreenPower BC") is a public company incorporated under the laws of British Columbia with a registered office at 800-885 West Georgia Street, Vancouver, British Columbia.

2.      Plaintiff GreenPower Motor Company, Inc., ("GreenPower DE") (together with GreenPower BC referred to as "GreenPower") is a Delaware corporation and a wholly owned subsidiary of GreenPower BC and, together, GreenPower designs, manufactures and sells a wide range of electric buses and vans to customers across North America.  GreenPower BC and GreenPower DE maintain headquarters in Vancouver, British Columbia, while GreenPower DE maintains a corporate office in Rancho Cucamonga, California.  There is a manufacturing facility in Porterville, California.

3.      Defendant Phillip Oldridge ("P. Oldridge") worked as the Chief Executive Officer ("CEO") of GreenPower until June 12, 2019, and as a director of GreenPower until July 2, 2019, pursuant to a services agreement between GreenPower and S & P Financial and Corporate Services Inc.  While in those roles, and thereafter, Oldridge worked with the Competitors, as defined below, to unfairly compete against GreenPower in breach of the duties that he owed to GreenPower.  He is currently employed as the CEO of one of the Competitors for an annual salary of $300,000.

4.      Defendant John Doe Trustee #1 is a trustee of a trust fund known as "Phillip Oldridge, in Trust" (the "Oldridge Trust"), having an address at 12475 Rocky Creek Road, Ladysmith, British Columbia. The Oldridge Trust is also an entity through which P. Oldridge indirectly held or holds shares in GreenPower.

5.      Defendant Envirotech Electric Vehicles Inc. ("EVT") is a private company incorporated under the laws of British Columbia with a registered office at 1103

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Goldstream Avenue, Victoria, British Columbia, Canada. EVT was incorporated on October 17, 2017.  P. Oldridge was a Director at EVIT while he was the CEO and a Director of GreenPower.  D. Oldridge is the President and Susan Emry the Vice-President of Finance for EVT.

6.    Defendant EVT Motors Inc. ("EVT Motors") is an entity whose nature is unknown to GreenPower at this time. In or around December 2019, the website for EVT was revised to replace certain references to EVT with EVT Motors and the current website of https:/evtusa.com refers to EVT Motors Inc.

7.    EVT and EVT Motors both have a corporate office at 530-1122 Mainland Street, Vancouver, British Columbia, Canada and the website listed P. Oldridge's Newport Beach office at 4100 Newport Place Drive, Suite 670, Newport Beach, California.

8.    Defendant Envirotech Drive Systems Incorporated ("EVT Drive BC") is a private company incorporated under the laws of British Columbia with a registered office at 530-1122 Mainland Street, Vancouver, British Columbia, Canada. EVT Drive BC was incorporated on August 7, 2018.

9.    Defendant Envirotech Drive Systems Incorporated ("EVT Drive US") is a private company incorporated under the laws of the State of Wyoming, with a registered office at Corporation Service Company, 1821 Logan Avenue, Cheyenne, Wyoming. EVT Drive US was incorporated on October 4, 2017.  From the date of incorporation, Susan Emry was and continues to be the President and Director and, for a period of time, was located at P. Oldridge's Newport Beach office at 4100 Newport Place Drive, Suite 670, Newport Beach, California.

10.   Defendant Envirotech Vehicles, Inc. ("Envirotech" was formerly named Adomani, Inc.) is a publicly traded company incorporated on November 29, 2016, in Delaware, with its principal place of business located in Corona, California, and, according to public filings, a subsidiary of Envirotech Vehicles, Inc.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

11.     EVT, EVT Motors, EVT Drive BC, EVT Drive US and Envirotech (collectively, the "Competitors") are each competitors of GreenPower in relation to the design, manufacture and sale of electric buses and vans in North America.

12.     Defendant David Oldridge ("D. Oldridge") is the brother of P. Oldridge and has a financial interest in the Competitors, and his interests and motives are aligned with P. Oldridge in nearly every way.  D. Oldridge currently holds multiple officer positions in the Competitors.

13.     Defendant Susan Emry ("Sue Emry") controls defendant S & P 500 Financial and Corporate Services Inc. along with P. Oldridge and is the incorporator for a number of the Competitors.  She is currently a Director, the interim CFO and Executive Vice President at one of the Competitors and has held multiple officer and director positions with the Competitors, including being a Director, President, CFO and Secretary of Envirotech Drive Systems Inc. from 2017 until March 2021, when that company merged with Adomani.

14.     S & P 500 Financial and Corporate Services Inc. (hereinafter "Sue & Phil Co") is incorporated in Kansas.  P. Oldridge served as a director and Sue Emry is the incorporator and President.  Sue & Phil Co is a corporation that P. Oldridge and Sue Emry utilize to run their personal finances through to avoid personal liabilities and taxes.  While P. Oldridge was serving in a capacity of contract CEO of GreenPower, this was done by having GreenPower pay Sue & Phil Co for the services rendered as reflected in the most recent CEO Services Agreement. **(Exhibit A.)** There is a unity of interest and ownership such that the separate personalities of the corporation (Sue & Phil Co) and the individuals (Sue Emry and P. Oldridge) do not exist, and that an inequity will result if the corporate entity is treated as the sole actor, as Sue Emry and P. Oldridge are the alter egos of Sue & Phil Co.

15.     D. Oldridge is presently listed as the Chief Technology Officer of Envirotech Vehicles, Inc.

16.     "Defendants" shall refer to all the defendants in this matter.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this matter involves federal questions in that it includes a claim for civil violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962, 1964(c)) ("RICO") and a claim for violation of the Defend Trade Secrets Act (18 U.S.C. §§ 1836 *et seq.*).  This court has supplemental jurisdiction of the other claims pursuant to 28 U.S.C. § 1367.

18.     This Court has specific personal jurisdiction over Defendants because they have purposefully availed themselves of the laws of the State of California through their activities in the state.  Further, upon information and belief, Defendants knew, or should have known, that their unlawful conduct arising in and from the State of California, as alleged in this Complaint, including but not limited to the unfair business practices and competition in the state, would harm GreenPower.

19.     Venue of this action in the Central District of California is proper because the conduct and activities of Defendants that give rise to the claims herein occurred from and in the Central District of California.  Thus, venue in this judicial district is proper because a substantial part of the events giving rise to this lawsuit, as well as substantial injury to GreenPower, have occurred or will occur in interstate commerce and in the State of California, including in the Central District of California.

## THE ALLEGATIONS

**A.     GreenPower's Business**

20.     GreenPower was started in March 2010. It was originally a privately-held company.

21.     From its founding through 2014, GreenPower was primarily focused on research and development. In 2014, GreenPower brought to market its first vehicle, the "EV350", which was a 40-foot electric transit bus.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

COMPLAINT OF GREENPOWER MOTOR COMPANY INC. and GREENPOWER MOTOR COMPANY, INC.
Case No.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

22.     On December 30, 2014, GreenPower became a publically traded company and commenced trading on the TSX Venture Exchange. Since that time, GreenPower has refined its technology and expanded its product offering.

23.     GreenPower's product line now includes:

a.      electric transit buses, of which there are three models: EV250 (a 30-32 foot bus), EV350 (a 40 foot bus) and EV550 (a 45 foot double-decker bus);

b.      electric school buses;

c.      electric shuttle buses; and

d.      electric mini-buses and vans, of which there are numerous models, including: EV Star, EV Star+, EV Star ADA, EV Star CC, EV Star Cargo and EV Star Cargo Plus.

24.     GreenPower's customers include government bodies (e.g., cities, transit authorities, airports), as well as commercial companies.

**B.      P. Oldridge's Shareholdings In GreenPower**

25.     P. Oldridge was an initial shareholder of GreenPower. In 2010, when the business was formed, he acquired 12,900,000 shares in GP GreenPower Industries Inc., which was the predecessor company to GreenPower and is now a subsidiary of GreenPower. The majority of those shares were issued to P. Oldridge at a cent or a tenth of a cent.

26.     In early 2012, P. Oldridge put 9,500,000 of these shares into the Oldridge Trust. On April 11, 2014, the Oldridge Trust sold 8,000,000 GreenPower shares to an entity identified by the name "Great Canadian Factoring Company Inc." or "Great Canadian Factoring Company Ltd." ("Great Canadian"). At the time, P. Oldridge represented that he was an officer, sole shareholder and sole director of Great Canadian.

27.     When GreenPower became a publically traded company, as part of a larger transaction, shares in GP GreenPower Industries Inc. were exchanged for an equal number of shares in GreenPower. Thus, at that time, and as reflected in insider

trading reports that P. Oldridge filed, P. Oldridge had the following shareholdings in GreenPower:

    a.     5,475,000 shares directly;

    b.     1,500,000 shares indirectly through the Oldridge Trust; and

    c.     8,350,000 shares indirectly through Great Canadian.

28.    These shareholdings resulted in P. Oldridge owning more than 10% of the issued shares of GreenPower, which made him an insider under securities law.

**C.    P. Oldridge's Duties To GreenPower**

29.    In addition to being a shareholder:

    a.     from before the company went public until July 2, 2019, P. Oldridge was a director of GreenPower; and

    b.     from January 1, 2011 until June 12, 2019, P. Oldridge, by and through an agreement with S & P, was providing GreenPower with CEO services and operating as an officer in the company.

30.    In his role, P. Oldridge owed GreenPower:

    a.     fiduciary duties, which included a duty of loyalty and a duty of care, the former of which required that he not permit himself to come into a position where his personal interests, or his duty to others, did or might conflict with his duty to GreenPower and a duty to avoid unfair competition after he ceased to be a director and/or officer (the "Fiduciary Duty"); and

    b.     duty of confidence not to misappropriate, misuse or otherwise improperly disclose GreenPower's confidential information (the "Duty of Confidence").

31.    In addition, it was an express ("Contract Duties'), or alternatively implied by law, that P. Oldridge would:

    a.     not misappropriate, misuse or otherwise disclose GreenPower's confidential information;

    b.     not compete, directly or indirectly, with GreenPower or any of its

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-7-

affiliates;

c.      not circumvent GreenPower in any of its business dealings or transactions;

d.      undertake his duties in accordance with the law; and

e.      comply with all securities laws.

32.      P. Oldridge breached his Fiduciary Duty, Duty of Confidence and Contractual Duties by failing to provide the work agreed upon and by working with the Competitors in direct competition with and at the expense of GreenPower.

**D.      P. Oldridge's Misrepresentations and Misconduct**

33.      When GreenPower became a publicly traded company, P. Oldridge was an insider.

34.      On May 19, 2016, through a private sale, Great Canadian sold 1,200,000 shares, which left it with 7,150,000 shares. On June 30, 2016, P. Oldridge exercised 50,000 warrants in GreenPower. P. Oldridge filed insider trading reports on SEDI for both transactions (the "Compliant Sales").

35.      In 2017, 2018 and 2019, for the purposes of the annual information circulars by which GreenPower was required to disclose P. Oldridge's holdings to the public, Oldridge represented to GreenPower (the "Representations") that he continued to have the following GreenPower shareholdings:

a.      5,525,000 shares directly;

b.      1,500,000 indirectly through the Oldridge Trust; and

c.      7,150,000 indirectly through Great Canadian.

36.      The Representations indicated that, since the Compliant Sales, P. Oldridge had not sold, or acquired, any further GreenPower shares.

37.      P. Oldridge knew or should have known that GreenPower would rely on the Representations because the Representations were made in response to an express request by GreenPower for him to disclose and/or confirm his shareholdings for purposes of including such information in the information circular.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

38.    GreenPower reasonably relied on each of the Representations and was induced by them to disclose to its shareholders and the general public, in each annual information circular, that P. Oldridge's shareholdings in the company were as represented and, accordingly, that P. Oldridge (the company's CEO) had not sold any other shares.

39.    P. Oldridge made knowingly false and misleading representations when he knew or should have known that he had directly or indirectly sold GreenPower shares since 2016 and that his interests were not as stated in the Representations.

40.    On November 19, 2019, P. Oldridge filed on the System for Electronic Disclosure ("SEDI") thirty-nine (39) separate insider trading reports, which included (the "Back-Dated Reports"):

    a.    reports for a series of trades in GreenPower's stock alleged to have taken place in 2016;

    b.    reports that, through 23 trades, he had personally sold 270,000 GreenPower shares between February 23, 2018 and August 2, 2018; and

    c.    a correction form, which claimed that Great Canadian had sold 7,150,000 (which would be all the shares held by Great Canadian after the Compliant Sales) on May 19, 2016 (the date of the Compliant Sale by Great Canadian).

41.    The Back-Dated Reports, if genuine, confirm that the Representations were false.

42.    By reason of P. Oldridge's misrepresentations, GreenPower has suffered loss and damage to its reputation, and has been exposed to potential claims from shareholders for misleading them as to the fact that, contrary to the information in the information circulars, P. Oldridge had sold a large volume of shares, representing a large proportion of his total shareholdings in the company.

43.    On December 1, 2017, P. Oldridge gave GreenPower notice of his resignation under his CEO Services Agreement for the purpose of attempting to

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

increase his compensation as GreenPower's CEO.  After discussions with the Chairman of the compensation committee, it was agreed that the compensation paid to Sue & Phil Co would be increased effective January 1, 2018 to US $20,000 per month and would continue moving forward on a month to month basis pursuant to the CEO Services Agreement. P. Oldridge continued as CEO of GreenPower.

44.     Concurrent with these discussions, P. Oldridge had advised the Board that he needed to move to California to build the factory planned on the land that GreenPower had purchased in Porterville.  GreenPower agreed to pay up to $30,000 of his moving costs as well as for a rental property for his family in Springville, California.  P. Oldridge purported to move there in 2018.

45.     The Factory in Porterville was never built.

46.     P. Oldridge abandoned the GreenPower operations in Porterville when he promptly moved to San Juan Capistrano and opened an office in Newport Beach, which office he shared with the Competitors and Sue Emry.  At all relevant times, P. Olridge, Sue Emry and D. Oldridge were conspiring with the Competitors to unfairly compete against GreenPower to its detriment.

**E.     The Competitors**

47.     Since in or about October 2017, the Competitors, or one or more of them, have designed, manufactured and marketed for sale (the "Competing Products"):

a.     a 25-foot electric passenger van, which competes directly with GreenPower's EV Star+;

b.     a Class 3 Transit Van, which competes directly with GreenPower's EV Star;

c.     a 6-meter electric logistics van, which competes with GreenPower's EV Star Cargo and EV Star Cargo Plus; and

d.     various other models of an all-electric passenger van and an all-electric cargo, which competes with GreenPower's EV Star product line.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

**F.      P. Oldridge's Breaches of Legal Duties**

48.      In breach of his Fiduciary Duty and Contractual Duties, P. Oldridge has been actively involved in the formation and development of the Competitors and, in particular, the Competing Products.

49.      Without the knowledge of GreenPower and, while all the details of such conduct are unknown to GreenPower at this time, such particulars include (the "Competitive Conduct"), but are not limited to:

a.      On July 3, 2017, a private company called Zero Nox, Inc. ("Zero Nox") was incorporated under the laws of the State of California. Since it was incorporated, P. Oldridge has been a director of Zero Nox. He is also an Engineering Consultant for Zero Nox. Zero Nox markets for sale the EVT Drive US product line, including some of the Competing Products, in North America. P. Oldridge has assisted Zero Nox in promoting its sales of the Competing Products, in direct competition with GreenPower. For a period of time EVT also shared space with Zero Nox at 525 Main Street in Porterville, California.

b.      Since EVT was incorporated in October 2017, P. Oldridge has also been a director of that company

c.      Oldridge, at GreenPower's expense, purported to travel for the purpose and under the auspices of extending GreenPower's supplier contacts, but did so with the secret intent to assist the Competitors by making contacts and arrangements for them and sharing GreenPower's confidential, proprietary and trade information, which the Competitors used for the purpose of setting up vendor relations and production facilities using information taken from GreenPower. Oldridge even submitted and requested reimbursements from GreenPower in connections with these trips for the benefit of Competitors.

d.      On or about January 19, 2018, P. Oldridge in his capacity as a Director of EVT, emailed a supplier of GreenPower soliciting an investment of CDN $3 million for EVT.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

e.     On or about April 2018, P. Oldridge and D. Oldridge travelled with executives of Adomani, Inc. ("Adomani") to Georgia, USA to meet with executives of Blue Bird to discuss the development of their all-electric school bus, which directly competes with GreenPower's school bus.

f.     On or about June 19, 2018, Adomani, which purported to provide advanced zero-emission electric and hybrid drivetrain solutions and purpose-built electric vehicles, announced that it intended to enter the electric truck market and would partner with EVT Drive US and sell EVT Drive US's range of products, including some or all of the Competing Products. P. Oldridge met with Adomani on EVT Drive US's behalf for the purpose of negotiating the partnership and, in so doing, effectively created another competitor to GreenPower.  On information and belief, this was all done with the knowledge and support of Sue Emry and D. Oldridge.

g.     In July 2018, P. Oldridge travelled to China and Malaysia with Adomani to further the partnership. Again, Oldridge made the trips on the pretext that he was doing GreenPower business and submitted, and was reimbursed for, the associated expenses. With P. Oldridge's assistance, the Adomani-EVT Drive US partnership has advanced to where it is now actively competitive with GreenPower in the marketplace.

h.     In or about October 2018, P. Oldridge, on behalf of Zero Nox and EVT Drive US and with D. Oldridge, Adomani's CEO, and other directors and officers of EVT in attendance, had a private meeting with British Columbia Premier John Horgan and British Columbia Green Party Leader Andrew Weaver for the purpose of advancing their competitive interests to the detriment of GreenPower.

i.     Since GreenPower became a publically traded company, P. Oldridge did not raise any money for the company. However, in 2018 and 2019, he helped raise at least $1,323,388 CDN for EVT and $450,000 USD for Zero Nox at the

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

same time as GreenPower was raising capital through the efforts of other executives of GreenPower, all while P. Oldridge was GreenPower's CEO via the arrangement with Sue & Phil Co.

j.    On June 24, 2019, P. Oldridge distributed an investor package, on behalf of EVT, EVT Drive US and/or EVT Drive BC, to potential investors. The investor package includes references to some of the Competing Products. However, to conceal the fact that P. Oldridge was assisting a competitor in the development of these products, those products are not listed on the Competitors' websites.

50.    At all material times, and without GreenPower's knowledge, P. Oldridge assisted the Competitors in their attempts to solicit and take business from GreenPower's current and prospective customers using inside information about GreenPower's business. While all the details of such conduct are unknown to GreenPower at this time, some examples include:

a.    On April 15, 2019, GreenPower announced that Green Commuter Inc. ("Green Commuter"), an all-electric vanpool provider in California, had ordered 100 EV Stars (it had previously ordered three). GreenPower has since learned that EVT Drive US (or another one of the Competitors) also bid on the job with its competing product.

b.    John Walsh, on behalf of ACE parking, had reached out to GreenPower for EV Stars, but instead P. Oldridge met with him and proposed to him EVT vehicles as a better and cheaper alternative than the GreenPower product. Later Walsh worked at EVT as a Sales Manager after being hired by P. Oldridge.

c.    Zero Nox has established an initiative to sell electric buses to schools and ports, both of which are customer bases that GreenPower targets.

d.    Zero Nox bid on an RFP from the City of Porterville for an all-electric passenger van. The City of Porterville is a significant customer of GreenPower.

51.    P. Oldridge and D. Oldridge assisted the Competitors, or one or more of

-13-

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

them, in obtaining eligible vehicle status on the California HVIP voucher program, which is a major source of customer funding for the purchase of GreenPower products.

52.     In addition, in his role with GreenPower, P. Oldridge acquired Confidential Information concerning GreenPower's business, the particulars of which include (the "Confidential Information"), but are not limited to, to such things as the identity and nature of GreenPower's vendor relationships and the economic terms of those relationships; the identity of GreenPower's customers and prospective customers, as well as the economic terms between GreenPower and its customers; the identity of GreenPower's target markets and potential customers, as well as its marketing plans and strategies; and product development and manufacturing information of GreenPower.

53.     In breach of his Fiduciary Duty, Duty of Confidence, and Contractual Duties, P. Oldridge, D. Oldridge and Sue Emry misused the Confidential Information obtained from GreenPower to pursue the Competitive Conduct and unfairly compete with GreenPower for their own personal financial benefit and gain, and also to the benefit of the Competitors with which they have maintained relations at relevant times.

54.     P. Oldridge, on behalf of himself and the other Defendants, concealed from GreenPower that they were involved in carrying out the Competitive Conduct.

55.     Moreover, since in or around 2017, with his focus on developing the business of the Competitors, Oldridge failed to devote sufficient time and attention to work for GreenPower. He would cancel, or simply not show up for, important meetings. He would be out of contact for long periods of time. While he was in charge of overseeing production, he would leave the process unattended for long periods of time, which resulted in gaps, cost overruns and problems fulfilling customer orders, including late deliveries.

56.     As a result of the Competitive Conduct and P. Oldridge's failure to fulfill the

-14-

responsibilities of his roles, GreenPower has suffered loss and damage in the form of lost revenues, lost business or equity financing, delays in manufacturing, delays in fulfillment of orders, delays in completing repairs to products previously issued, as well as the loss of the amounts paid to Sue & Phil Co while Defendants were engaged in their scheme associated with the Competitive Conduct, and lost business, all in amounts to be proven at trial.

**G.      P. Oldridge Is Summarily Dismissed and Then Purports to Resign**

57.      GreenPower confronted P. Oldridge about his Competitive Conduct, but he brushed it aside and claimed to have no involvement with the Competitors. However, when presented with evidence to the contrary, P. Oldridge stated that he was frustrated with GreenPower and that his other activities were none of Green Power's business.

58.      On June 12, 2019, GreenPower terminated its employment relationship with P. Oldridge.

59.      On July 2, 2019, P. Oldridge submitted his resignation as director of GreenPower.

**H.      Intention To Harm**

60.      P. Oldridge was granted certain stock options. Before he submitted his resignation as a director, P. Oldridge had stock options that entitled him to acquire 1,566,860 shares at $0.25. At the time, those options were in the money in the amount of around $500,000.

61.      P. Oldridge did not have the funds available to exercise the options. Accordingly, in July 2019, P. Oldridge met with certain shareholders of GreenPower and proposed a side deal of $0.36 to $0.38 per share so that P. Oldridge had the funds to exercise the options.

62.      However, pursuant to the stock option plan, P. Oldridge's options expired when he resigned as a director.

63.      On July 15, 2019, GreenPower advised P. Oldridge that his options had

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

expired. P. Oldridge was extremely upset and told a GreenPower shareholder that he was going to **"burn GreenPower to the ground"** and that he did not care what the consequences of his actions were.

64.     In accordance with his threats and through a series of transfers, P. Oldridge sought to and did manipulate GreenPower's stock price with the intent to injure GreenPower by lowering the value of its shares and overall value and, thereby, to damage its business and reputation.

**I.     Conspiracy**

65.     In or around the time each Competitor was formed, P. Oldridge, D. Oldridge, Sue Emry, and the Competitors unlawfully combined or conspired with each other by entering into an agreement to have P. Oldridge carry out the Competitive Conduct and the Breaches of Confidence in order to build the business of the Competitors and unfairly compete with GreenPower in the sale of electric buses and cargo vans, as well as to benefit each of them financially to GreenPower's detriment.

66.     The conduct of P. Oldridge, D. Oldridge, Sue Emry, and the Competitors in furtherance of their conspiracy, was unlawful and was directed towards GreenPower, and the intent to injure and likelihood of injury to GreenPower was at all material times known, or reasonably ought to have been known, to the Defendants.

67.     Pursuant to their conspiracy, P. Oldridge, D. Oldridge, Sue Emry, and the Competitors carried out or caused to be carried out the Competitive Conduct and the Breaches of Confidence, which were aimed or directed at GreenPower, and which they could reasonably foresee would injure GreenPower.

68.     As a result of the acts carried out by P. Oldridge, D. Oldridge, Sue Emry, and the Competitors in furtherance of their conspiracy, GreenPower has suffered loss and damage and continues to suffer loss and damage in the form of lost revenues, lost financing opportunities and other losses, all in amounts to be proven

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1    at trial.  As a result, Defendants, and each of them, are liable for such damages.

2    69.    Further, GreenPower is entitled to punitive damages, as the Defendants'

3    conduct was done with the intent to harm GreenPower and was the result of fraud,

4    malice and/or oppression.

5    **J.    Theft By False Pretense**

6    70.    During his time at GreenPower, P. Oldridge had the ability to have certain

7    work-related expenses of his reimbursed by GreenPower.

8    71.    While he had this ability, P. Oldridge would often submit his expenses for

9    reimbursement from GreenPower.

10   72.    GreenPower later learned that P. Oldridge did not just submit expenses for

11   reimbursement for GreenPower-related activities, but he submitted expenses he

12   incurred in pursuing activities for the benefit of the Competitors and the conspiracy

13   with each defendant to advance their interests to the detriment of GreenPower.

14   73.    Examples of this include claimed expenses relating to travel to China under

15   the guise of doing so on behalf of GreenPower, when he in fact sought to have

16   meetings with Chinese-based companies (that do business with GreenPower) for

17   the purpose of establishing a relationship between the Chinese-based companies

18   and the Competitors.  Also, P. Oldridge had dinners with executives of the

19   Competitors and others for the purpose of furthering the Competitors' business and

20   then sought to recoup the costs via expense reports with GreenPower.

21   74.    GreenPower did not know that the money it "reimbursed" to P. Oldridge

22   was, in many cases, unrelated to expenses incurred in the furtherance of

23   GreenPower's business objectives, but were in fact costs incurred in the

24   furtherance of business objectives of the defendant co-conspirators and their

25   business interests.

26   75.    In order to complete this scheme, P. Oldridge intentionally misstated the

27   activities that he was seeking reimbursement for and intentionally transmitted these

28   false reimbursement documents to GreenPower via emails.  GreenPower relied on

-17-

1  the accuracy these documents to give P. Oldridge the property/reimbursement

2  funds he was claiming.

3  ### FIRST CAUSE OF ACTION FOR CIVIL RICO VIOLATIONS

4  (against P. Oldridge, Sue & Phil Co, John Doe Trustee #1, Does 1-50)

5  76.   GreenPower realleges each and every allegation set forth above and

6  incorporates them herein.

7  77.   P. Oldridge repeatedly and consistently utilized the United States Mail and

8  electronic mail system to perpetuate a scheme of theft from GreenPower, some of

9  which is described above.

10  78.   In addition to the above, P. Oldridge violated securities laws by improperly

11  failing to disclose information that he was required to disclose, some of which is

12  described above.

13  79.   P. Oldridge did not do this alone.  He was assisted by accomplices to his

14  actions who included D. Oldridge, Sue Emry, Sue & Phil Co, and the Competitors,

15  with whom P. Oldridge consulted with when devising the plan to harm

16  GreenPower for the benefit of himself, the Competitors, and anyone associated

17  with the competitors.

18  80.   Each of these acts of stealing and embezzling from GreenPower were related

19  to one another in that they were all done to further the motives of the Competitors

20  while using false pretenses to fund the business activities of the Competitors.

21  81.   The above conduct caused injury to GreenPower.

22  ### SECOND CAUSE OF ACTION FOR CONSPIRACY TO COMMIT CIVIL

23  ### RICO VIOLATIONS

24  (against all Defendants)

25  82.   GreenPower realleges each and every allegation set forth above and

26  incorporates them herein.

27  83.   Defendants formed and took part in a plan/agreement which involved P.

28  Oldridge utilizing the United States Mail and electronic mail system to perpetuate

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-18-

a scheme of injurious theft from GreenPower for the benefit of himself and the Competitors.

84.     Defendants each engaged in conduct that was intended to assist P. Oldridge in utilizing the United States Mail and electronic mail system to perpetuate a scheme of stealing and embezzling from GreenPower for the benefit of himself and the Competitors, by discussing the plan, offering advice and then actively utilizing the improper gains from the conspiracy in accordance to the plan/agreement.

85.     GreenPower suffered damage as result of this conduct.

### THIRD CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY

(against P. Oldridge)

86.     GreenPower realleges each and every allegation set forth above and incorporates them herein.

87.     P. Oldridge was the CEO, director, and senior officer at GreenPower.

88.     By virtue of these positions P. Oldridge owed a fiduciary duty to GreenPower itself as well as to GreenPower's shareholders.

89.     P. Oldridge breached this duty by the actions described above.

90.     These actions caused GreenPower to be damaged as described above.

### FOURTH CAUSE OF ACTION FOR CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY

(against all Defendants)

91.     GreenPower realleges each and every allegation set forth above and incorporates them herein.

92.     Defendants and each of them formed and took part in a plan/agreement that involved P. Oldridge breaching his fiduciary duties in a way so as to injure GreenPower and help the Competitors.

93.     Defendants and each of them engaged in conduct that was intended to assist P. Oldridge in breaching his fiduciary duties by discussing the plan, offering advice and then actively utilizing the improper gains from the conspiracy in

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

COMPLAINT OF GREENPOWER MOTOR COMPANY INC. and GREENPOWER MOTOR COMPANY, INC. Case No.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

accordance to the plan/agreement.

94.     GreenPower suffered damages as a result of this conduct.

## FIFTH CAUSE OF ACTION FOR BREACH OF CONTRACT

(against Sue & Phil Co., P. Oldridge and Does 1-50)

95.     GreenPower realleges each and every allegation set forth above and incorporates them herein.

96.     GreenPower and Sue & Phil Co entered into a written agreement in which P. Oldridge would perform CEO services for GreenPower and GreenPower's subsidiary would pay Sue & Phil Co.  A copy of this agreement is provided as **Exhibit A**.  After the expiration of the initial term set forth in the contract, it continued from month to month, as per the terms of the agreement, until P. Oldridge's relationship with GreenPower ended.

97.     GreenPower performed all of its obligations in paying Sue & Phil Co.

98.     Sue & Phil Co and P. Oldridge breached their duties in violation of the contract as described above.

99.     GreenPower was damaged by the breach of contract because it lost money and value, including but not limited to all monies paid to Sue & Phil Co.

## SIXTH CAUSE OF ACTION FOR CONVERSION

(against P. Oldridge and Does 1-50)

100.    GreenPower realleges each and every allegation set forth above and incorporates them herein.

101.    GreenPower owned certain property, including money set aside to pay certain qualifying costs and/or expenses, and had the right to possession of this property.

102.    P. Oldridge obtained this property, which he knew was owned by GreenPower, through the consent of GreenPower due to P. Oldridge's deceit and fraud.

103.    P. Oldridge intended to permanently deprive GreenPower from having this

property.

104.   P. Oldridge then kept this property for an unknown length of time.

**SEVENTH CAUSE OF ACTION FOR VIOLATION OF THE DEFEND**

**TRADE SECRETS ACT (18 U.S.C. §§ 1836 *et seq.*)**

(against all Defendants)

105.   GreenPower realleges each and every allegation set forth above and incorporates them herein.

106.   GreenPower owned a number of trade secrets, described above, which provided GreenPower value and assisted GreenPower in successfully operating.

107.   These trade secrets were not publicly known and GreenPower took reasonable measures to keep this information secret by protecting who at GreenPower had access to this information and making those with access sign appropriate agreements.

108.   The trade secrets derive independent economic value from not being generally known and not being readily ascertainable.

109.   P. Oldridge for himself and all Defendants misappropriated a number of those trade secrets, as described above.

110.   The misappropriations have caused damage to GreenPower and continue to be a threat of additional damage.

**EIGHTH CAUSE OF ACTION FOR VIOLATION OF BUSINESS &**

**PROFESSIONS CODE §§ 17200**

(against all Defendants)

111.   GreenPower realleges each and every allegation set forth above and incorporates them herein.

112.   The Defendants' conduct, as herein described above, was unfair, unlawful, wrongful and/or fraudulent.

113.   As a result, GreenPower is entitled to restitution for all harm caused by such conduct.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

COMPLAINT OF GREENPOWER MOTOR COMPANY INC. and GREENPOWER MOTOR COMPANY, INC.
Case No.

114.   In addition, GreenPower seeks an injunction prohibiting the Competitors from realizing the benefit of their improper conduct.

## NINTH CAUSE OF ACTION FOR UNFAIR COMPETITION (BUSINESS & PROFESSIONS CODE § 16727

### (against all Defendants)

115.   GreenPower realleges each and every allegation set forth above and incorporates them herein.

116.   The Defendants' wrongful actions outlined above constitute unfair competition and reflect the improper utilization of a disgruntled insider of a competitor to compete with an established business in an unfair manner.

117.   The Defendants' continued acts of unfair competition will continue to cause harm to GreenPower unless enjoined.

118.   The Defendants' conduct has been knowing, deliberate, willful, and conducted with the intent to injure GreenPower and benefit the Defendants, which entitles GreenPower to an award of punitive damages.

119.   GreenPower is also entitled to relief, including injunctive relief and restitution of all lost income and benefits that were denied to GreenPower as a result of the Defendants' actions and unfair business practices.

## PRAYER FOR RELIEF

WHEREFORE, GreenPower prays for judgment against the Defendants as follows:

1.    An award of compensatory and punitive damages against the Defendants in amounts to be proven at trial;

2.    An award of injunctive relief prohibiting any of the Defendants from engaging in unlawful and anti-Competitive business practices to the detriment of GreenPower;

3.    Restitution for harm caused to Greenpower in amounts to be proven at trial;

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

COMPLAINT OF GREENPOWER MOTOR COMPANY INC. and GREENPOWER MOTOR COMPANY, INC. Case No.

4.     An award of treble damages under 18 U.S.C. § 1964;

5.     Attorney's fees pursuant to statute;

6.     Pre-judgment and post-judgment interest at the legal rate; and

7.     Costs of suit and such other and further relief as the Court deems just, proper and equitable.

Dated:  February 8, 2022

GORDON REES SCULLY
MANSUKHANI, LLP

By: _____
David L. Jordan
Myles Lanzone
Plaintiffs
GREENPOWER MOTOR
COMPANY INC. and
GREENPOWER MOTOR
COMPANY, INC.

1

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Civil Local Rule 3-6(a), GreenPower requests a trial by jury of all issues and claims for relief so triable.


Dated:  February 8, 2022

GORDON REES SCULLY
MANSUKHANI, LLP


By:

David L. Jordan
Myles Lanzone
Plaintiffs
GREENPOWER MOTOR
COMPANY INC. and
GREENPOWER MOTOR
COMPANY, INC.

# EXHIBIT A

# EXHIBIT A

## MANAGEMENT SERVICES AGREEMENT

**THIS AGREEMENT** is made effective as of the 1st day of January, 2016.

**BETWEEN:**

> **GreenPower Motor Company, Inc.**, a Delaware Company, having its office at 31 – 7000 Merrill Avenue, Chino, CA  91710
>
> (hereinafter called "**GreenPower**")

**AND:**

> **S & P 500 Financial and Corporate Services Inc.** a Kansas Company having its office at 104 S Penn Ave, Oberlin, KS 67749
>
> (hereinafter called the "**Manager**")

**WHEREAS:**

    **A.**    GreenPower Motor Company, Inc. is a subsidiary of GreenPower Motor Company Inc. a public company that is a reporting issuer whose shares are listed for trading on the TSX Venture Exchange which develops electric powered vehicles for commercial markets. GreenPower Motor Company Inc. offers a range of all-electric heavy duty and school buses deploying electric drive and battery technologies with a lightweight chassis and low floor or high floor body. These all-electric buses are based on a flexible clean sheet design and utilize a custom battery management system and a proprietary Flex Power system for the drive motors. GreenPower Motor Company Inc. sources and integrates key vehicle components from global suppliers, such as Siemens for the two drive motors, Knorr for the brakes, ZF for the axles and Parker for the dash and control systems;

    **B.**    S & P 500 Financial and Corporate Services Inc. (the "Manager") is a private company that provides professional and management services and has personnel who are qualified to provide professional and management services to GreenPower and such personnel possess the requisite skills, expertise, experience and contacts to provide such services to GreenPower; and

    **C.**    GreenPower wishes to engage the Manager and its personnel to provide the services more particularly set in Article 1 and the terms and conditions of this Agreement.

    **NOW THEREFORE THIS AGREEMENT WITNESSES** that, in consideration of the premises and of the mutual covenants and agreements herein contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by each of the parties, the parties covenant and agree as follows:

## ARTICLE 1
## PROVISION OF SERVICES

**1.1**        **Appointment of the Manager**

    Effective the 1st day of January, 2016, the Manager's designated personnel shall be engaged by GreenPower with the duties set out in this Agreement, as amended from time to time, and the Manager accepts the appointment with the designated personnel being Phillip Oldridge acting as the Chief Executive Officer ("CEO") of GreenPower and the CEO of all of GreenPower's affiliated companies including its parent company for a term of one year, reporting to the Board of Directors of GreenPower Motor Company Inc.

GP000421

2

**1.2**         **The Services**

The Manager shall cause its designated personnel to provide the services (the "Services") to GreenPower as set forth in the attached Schedule A or such other duties as GreenPower or its affiliated companies or the Board of Directors of GreenPower Motor Company Inc. shall from time to time require.

**1.3**         **Provision of The Services**

The Manager will report to the Board of Directors of GreenPower Motor Company Inc. and the Manager will provide GreenPower and its affiliated companies with the Services within such reasonable timeframe, to such extent and in such manner and specifications as requested by GreenPower from time to time, acting reasonably.

**1.4**         **Terms**

The Manager agrees to devote his full time efforts in the performance of the Services.

**ARTICLE 2**
**COMPENSATION FOR SERVICES**

**2.1**         **Base compensation**

So long as this Agreement remains in effect, GreenPower shall pay the Manager a Base Net Fee of USD $10,000 per month for carrying out the services payable on the last day of each month.   The Base Fee does not include any bonuses that might be paid to the Manager for carrying out the Services.  Any out of pocket costs incurred by the Manager will be reimbursed by GreenPower.

**2.2**         **Bonuses\Stock Options**

The Manager is eligible to participate in any bonus plan or stock option plan that the Company makes available to the management team.

**ARTICLE 3**
**TAXES**

**3.1**         **Taxes**

This Agreement contemplates that the Manager will be a contractor to GreenPower. The Manager hereby agrees to pay any taxes now or in the future owing as a result of the payment of the Compensation paid to the Manager pursuant to this Agreement.

**ARTICLE 4**
**NON-DISCLOSURE, NON-COMPETE AND NON-CIRCUMVENTION**

**4.1**         **Non-Disclosure**

The Manager shall not, during the term of this Agreement, and for a period of twenty four (24) months after the termination of this Agreement, divulge, publish or otherwise reveal, either directly or through another person, to any person, firm or corporation any information concerning proprietary information belonging to GreenPower or of any of its affiliates.

**4.2**         **Non-Compete**

The Manager shall not, during the term of this Agreement, and for a period of twenty four (24) months after the termination of this Agreement, divulge, directly or indirectly compete with the business of GreenPower or of any of its affiliates.

GP000421.02

**4.3**        **Non-Circumvention**

It is hereby agreed that the Manager will not circumvent GreenPower in any of its business dealings or transactions.

## ARTICLE 5
## TERM AND TERMINATION

**5.1**        **Term**

This agreement shall be for a term of one year from the date of this Agreement.  If neither party has provided the other party with a notice of termination then the Agreement shall automatically renew on a month to month basis.

**5.2**        **Termination by Either Party**

GreenPower may terminate the Manager for cause and either the Manager or GreenPower, may terminate this Agreement immediately upon written notice to the other where:

(i)        the other is in breach of any provision of this Agreement and such breach is not remedied within sixty (60) days written notice; or

(ii)        if the other passes a resolution or any order is made for the winding-up, disillusionment, bankruptcy or other form of creditor protection of that party;

## ARTICLE 6
## MISCELLANEOUS

**6.1**        **Notice**

All notices and other communications between the parties to this Agreement shall be in writing and shall be deemed to have been given if delivered personally or by confirmed facsimile to the parties at the following addresses (or at such other address for any such party as shall be specified in like notice):

(a)        if to GreenPower:

31 – 7000 Merrill Avenue, Chino, CA  91710

(b)        if to the Manager:

104 S Penn Ave, Oberlin, KS 67749

Any notice or other communication given personally shall be deemed to have been given and received upon delivery thereof and if given by facsimile shall be deemed to have been given and received on the date of confirmed receipt thereof unless such day is not a business day in which case it shall be deemed to have been given and received upon the immediately following business day.

**6.2**        **Amendment and Waiver**

No amendment or waiver of this Agreement shall be binding unless executed in writing by both GreenPower and the Manager.  No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision nor shall any waiver constitute a continuing waiver unless otherwise expressly provided.

GP000421.03

4

**6.3**         **Assignment and Successors**

This Agreement shall not be assigned without the written consent of the other party, which consent may be unreasonably withheld.  This Agreement will be binding upon and will enure to the benefit of the parties and upon their respective successors and permitted assigns.

**6.4**         **Governing Law**

This Agreement will be governed by and construed in accordance with the laws of the GreenPower being the State of Delaware, which will be deemed to be the proper laws of this Agreement.  Subject to section 6.5 of this Agreement, each of the parties irrevocably attorns to the jurisdiction of the Courts of Delaware and all disputes relating to this Agreement will be resolved in the courts of Delaware.

**6.5**         **Severability**

If any covenant, obligation or term of this Agreement, or the application thereof to any party or circumstance will, to any extent, be invalid or unenforceable, then the remainder of this Agreement or the application of such covenant, obligation or term to parties or circumstances other than those as to which it is held invalid or unenforceable will not be affected thereby and each covenant, obligation and term of this Agreement will be separately valid and enforceable to the fullest extent permitted by the law.

**6.6**         **Entire Agreement**

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and collectively cancels and supersedes all prior discussions, expectations, understandings, communications, representations and agreements whether verbal or written between the parties with respect to the subject matter hereof.

**6.7**         **Non-Waiver**

No condoning, excusing or waiver by any party to this Agreement of any default, breach or non-observance by any other party to this Agreement at any time in respect of any covenant, provision or condition contained in this Agreement will operate as a waiver of that party's rights under this Agreement, or so as to defeat or affect in any way the rights of that party, in respect of any continuing or subsequent default, breach or non-observance, and no waiver will be inferred from or implied by anything done or omitted to be done by the party having those rights.

**6.8**         **Headings**

The insertion of headings in this Agreement are for convenience of reference only and will not affect the construction or interpretation of this Agreement.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement effective as of the day and year first above written.


**S & P 500 Financial and Corporate Services Inc.**
Per:


_____
**Phillip Oldridge, President**


**GreenPower Motor Company, Inc.**
Per:

_____

**Fraser Atkinson, Chairman**

GP000421.05

6

Exhibit A

The Chief Executive Officer ("CEO") is responsible for leading the development and execution of the Company's long term strategy with a view to creating shareholder value. The CEO's leadership role also entails being ultimately responsible for all day-to-day management decisions and for implementing the Company's long and short term plans. The CEO acts as a direct liaison between the Board and management of the Company and communicates to the Board on behalf of management. The CEO also communicates on behalf of the Company to shareholders, employees, Government authorities, other stakeholders and the public.

More specifically, the duties and responsibilities of the CEO include the following:
1. to lead, in conjunction with the Board, the development of the Company's strategy;
2. to lead and oversee the implementation of the Company's long and short term plans in accordance with its strategy;
3. to ensure the Company is appropriately organized and staffed and to have the authority to hire and terminate staff as necessary to enable it to achieve the approved strategy;
4. to ensure that expenditures of the Company are within the authorized annual budget of the Company;
5. to assess the principal risks of the Company and to ensure that these risks are being monitored and managed;
6. to ensure effective internal controls and management information systems are in place;
7. to ensure that the Company has appropriate systems to enable it to conduct its activities both lawfully and ethically;
8. to ensure that the Company maintains high standards of corporate citizenship and social responsibility wherever it does business;
9. to act as a liaison between management and the Board;
10. to communicate effectively with shareholders, employees, Government authorities, other stakeholders and the public;
11. to keep abreast of all material undertakings and activities of the Company and all material external factors affecting the Company and to ensure that processes and systems are in place to ensure that the CEO and management of the Company are adequately informed;
12. to ensure that the Directors are properly informed and that sufficient information is provided to the Board to enable the Directors to form appropriate judgments;
13. to ensure the integrity of all public disclosure by the Company;
14. in concert with the Chairman, to develop Board agendas;
15. to request that special meetings of the Board be called when appropriate;
16. to sit on committees of the Board where appropriate as determined by the Board; and
17. to abide by specific internally established control systems and authorities, to lead by personal example and encourage all employees to conduct their activities in accordance with all applicable laws and the Company's standards and policies, including its environmental, safety and health policies.